PHILIP I. MARVEL

v.

NETTIE FRALINGER et al.

[Filed September 4th, 1903.]

The circumstances adduced in a suit to compel specific performance of a contract—*Held*, to support the positive testimony of complainant that the contract was signed, and to overcome the negative testimony of the defendants in their sworn answers to interrogatories.

*Mr. George A. Bourgeois* and *Mr. Clarence L. Cole,* for the complainant.

*Mr. Samuel H. Grey* and *Mr. E. Cooper Shapley,* for the defendants.

REED, V. C.

This bill is filed to compel the defendant Nettie Fralinger to specifically perform a contract to convey a one-fourth interest in a certain tract of land in Atlantic City.

This property appears to have been owned by Nettie Fralinger, John L. Young, Stewart McShea and the complainant, Dr. Marvel, each owning a one-fourth interest. There was a mortgage upon the property of $43,000. The alleged facts upon which the complainant's suit is based are these: Prior to August 24th, 1899, there was a parol agreement between Dr. Marvel and the three other owners, by which these three were to convey their interest to Dr. Marvel. On the evening of August 25th the parties met, confirmed the terms of sale, and Dr. Marvel gave a certified check for $10,000 as part of the consideration for the purchase. This check was dated August 24th, and was made payable to the order of Dr. Marvel himself and was endorsed by him. A receipt was given for the check by Mr. Young,

11

Marvel *v.* Fralinger.

one of the owners, in which it was stated that the check was given on account of the purchase of the tea property, this being admittedly the property in question. A formal agreement, in writing, was later prepared by Walter McShea, a lawyer and a son of Stewart McShea, one of the owners. This agreement was signed by Mr. Stewart McShea, by Young and Mr. and Mrs. Fralinger, and presented to Dr. Marvel by Walter McShea. Dr. Marvel refused to accept this agreement, because it recited that the consideration for the property was $200,000 *and* the mortgage of $43,000. Mr. Walter McShea then prepared another agreement, dated August 25th, 1899, which he presented to Dr. Marvel, and which Dr. Marvel refused to accept, because it recited that the consideration was $182,250 and the assumption of the mortgage of $43,000, while the real consideration for the three-fourths interest to be conveyed was $150,000, including the mortgage. Then a third agreement was prepared, which was explanatory of, and supplemental to, the last-named agreement. This agreement was signed by Mr. and Mrs. Fralinger, in their store, in the presence of Dr. Marvel and Mr. Cole.

Dr. Marvel, upon the reception by him of the explanatory agreement, accepted also the second agreement, which second agreement, as already remarked, stated the consideration to be $182,250 and the assumption of the $43,000 mortgage. The explanatory agreement recites that whereas the agreement of August 25th, 1899 (the second agreement just mentioned), fixed the consideration to be paid for the interests of McShea, Young and Fralinger by defendant at the sum of $182,250, and whereas the said parties have given a receipt to Dr. Marvel for $32,250, which sum has not, in fact, been paid, but was given for services rendered, according as agreed to, as a benefit to said Marvel; whereas $10,000 were paid at the time of signing the second agreement, now this agreement witnesseth, that the true consideration for the transfer of the property is the sum of $150,000, and not $182,250, as stated in said agreement, and that, upon the settlement under the terms of said agreement, only the sum of $150,000, less the mortgage, is to be paid.

Dr. Marvel's explanation why he accepted the second agreement with the explanatory agreement instead of having the

true consideration put in a single agreement is this: He had entered into an agreement to sell a one-half interest in the property to a Mr. Hamburg at the rate of $243,000 for the entire interest in the property, or $121,500 for one-half, and he wished it to appear that in purchasing the property, he, Marvel, had paid at the same rate. His purpose in doing this, he says, was that in case he should die before the transaction with Mr. Hamburg was consummated, the latter could not say that his agreement was to buy at the same rate that Dr. Marvel had purchased, and then rely upon the agreement for sale to Dr. Marvel as evidence that the doctor had really bought at the rate of $200,000 for the whole property, or $100,000 for a half interest.

It may be remarked here that the sum of $182,250 is made up of three-quarter interests at the rate of $200,000 for the entire property, and three-fourths of the $43,000 mortgage, namely, $38,250. Dr. Marvel's claim is that the true consideration is shown by the explanatory agreement, which he says was signed by Fralinger.

This agreement is not produced. Dr. Marvel explains its non-production by saying that after it was signed he handed it to Mr. Young, who placed it in his safe, and that subsequent search has failed to discover it. The pivotal point in the case is whether this supplementary agreement was ever signed by Mr. and Mrs. Fralinger.

Dr. Marvel swears that an agreement, a copy of which is attached to the answer, and known in the case as *Exhibit C 3,* was signed by Mr. and Mrs. Fralinger.

Neither Mr. or Mrs. Fralinger, the defendants, was sworn as a witness upon the trial.

There were attached to the bill, however, certain interrogatories propounded to them, which they have answered under oath. The answers to these interrogatories, so far as they are responsive, have, by the statute, the force of a sworn answer. To the interrogatory respecting the execution of the explanatory agreement, styled in the interrogatories *Exhibit B,* the defendants answer that they have no knowledge of its existence; that it was never seen by them or either of them, and they aver that it was never executed.

The truth of the answers to the interrogatories is sworn to "to the best of the knowledge and belief" of the affiants.

The phraseology used by the affiants, it is contended, deprive their answers of the force which they would have had had they positively sworn that the explanatory agreement was never executed. It is insisted that the answers have no greater force than if they were sworn to on information and belief.

The strength of the affidavit sworn to in this language must depend upon the fact which is the subject of the affidavit. Where the fact is one concerning which the affiant may have had no knowledge, the affidavit amounts to no more than one made upon belief only. Where, however, as in this case, the fact is one concerning the affiant's personal act, of which he must have had knowledge, had it existed, the affidavit is an assertion under oath that the affiant, using his best recollection, is unable to recall such an occurrence.

The attitude of the parties, then, is this: Dr. Marvel swears to a positive act occurring in his presence, and the defendants swear that they have no recollection of such an act, after using their best endeavors to recall it.

Assuming, however, that the answer of the husband and wife has the strength of a single sworn answer, which throws upon the complainant the burden of supporting his testimony by that of another witness or by some corroborating circumstance, the query remains whether the complainant is so supported.

That an agreement similar in language to the explanatory agreement was actually drawn is supported by the testimony of Judge Thompson. Judge Thompson testifies that about the time mentioned he was one day about leaving his office when Walter McShea, who was seated trying to dictate an agreement, called to Judge Thompson and told him what he was doing. The result was that Judge Thompson himself sat down and dictated an agreement. Upon being shown what purports to be a copy of the explanatory agreement, Judge Thompson said: "I have examined this paper, and I believe it to be the paper that I dictated, at Walter McShea's suggestion, to my stenographer about that time."

Marvel *v.* Fralinger.

That a paper (which paper Dr. Marvel says was the explanatory agreement) was about that time signed by Mr. and Mrs. Fralinger at their confectionery store, in Atlantic City, is proved beyond doubt by the testimony of Mr. Cole. He tells of Dr. Marvel's calling upon him and asking him to go with the doctor to the Fralingers' to witness a paper; that a writing was produced by Dr. Marvel; that Mr. Fralinger was there and Mrs. Fralinger was sent for, and in his, Mr. Cole's presence, and in the presence of Dr. Marvel, Mr. and Mrs. Fralinger signed the paper. Was this paper the explanatory agreement which Judge Thompson dictated? Dr. Marvel says it was. No other witness supports him directly in that assertion.

I think it may be assumed, however, that the paper then and there signed must have been either the second agreement of August 25th or the explanatory agreement. There is nothing to show that there was any written dealing between Dr. Marvel and the Fralingers except in connection with the sale of this property. It does not appear at what place the Fralingers signed the first-mentioned agreement. The Fralingers were asked this question in the first interrogatory propounded, which was this: "When and where and by whom *Exhibit A* was executed." The defendants answer that *"Exhibit A* was executed in September, 1899, as a final agreement between the parties. After execution a copy was delivered to each party."

This answer, it is perceived, leaves unanswered that part of the interrogatory which asked for information as to where it was signed, as well as by whom it was signed.

If it had been signed at Fralingers' store by the Fralingers it is highly probable that Mr. Fralinger, at least, would have recalled that fact, and if he had recalled it he would naturally have insisted that the complainant and Mr. Cole had confused the execution of *Exhibit A* with the supposed execution of the explanatory agreement. If *Exhibit A* was not signed when Mr. Cole visited the Fralingers, some other agreement certainly was signed, and the strong probability is that it was the explanatory agreement.

Another circumstance may have some significance. Dr. Marvel

visited the Fralingers, in company with Judge Thompson, on a later occasion, to make a tender to Mr. Fralinger of the amount due to Mrs. Fralinger under the terms of the explanatory agreement. He told Mr. Fralinger the purpose of his visit and asked him to call his wife. Mr. Fralinger said that was not necessary; that he would act for her; but, upon Judge Thompson insisting, she was called, and in her presence Judge Thompson began to count out the amount due, as they supposed, under the explanatory agreement. Judge Thompson says that Mr. Fralinger then remarked that he would not require the money to be counted, but would acknowledge that there was that much money there. The judge then presented a deed, to be signed, and Mr. Fralinger said that he wanted to consult his solicitor, and did so over the telephone, after which he declined to sign the deed. The reason then assigned by Mr. Fralinger for his refusal was that Mr. Young, who had agreed to sell his interest in the property in concert with McShea and Fralinger, was not acting squarely with them, and did not intend to sell.

Now, the amount tendered was less by several thousand dollars than the amount due under the terms of the first agreement, and no objection seems to have been raised by the Fralingers on that account. It must be admitted, however, that the force of any inference to be drawn from this fact is blunted by the consideration that Mr. Fralinger's mind, being intent upon a refusal of the tender upon the other ground, may have paid no attention to the amount.

There is another circumstance. Dr. Marvel says that the terms of the purchase were agreed upon at a meeting held on the evening of August 25th. At that meeting Fralinger was undoubtedly present with Young and McShea. At that meeting, Dr. Marvel says, the question of giving a receipt for the $32,250 part of the consideration of $182,250 was discussed, and someone (he thinks Fralinger) was opposed to giving a receipt for money that was not paid. It was at this meeting that the check for $10,000, in part payment of the three interests of the three vendors, was handed to Mr. Young, for which Mr. Young at that time gave a receipt, dated August 25th. This receipt states for

what the check was given; that it was given in consideration for part payment for this property, the full amount, including the mortgage, to be $200,000. This meant undoubtedly that the property was sold upon that basis for the whole interest. It was undoubtedly understood that Mr. Young received this check for himself and the three other selling owners. He had the check cashed or placed on deposit to his credit, and he paid McShea and Fralinger each one-third of its amount. He gave this receipt and memorandum as a part of the transaction which occurred on the evening of August 25th, and I have no doubt it represents the general understanding of the parties at that time. Mr. McShea conveyed his one-fourth interest for the consideration mentioned.

While this receipt would not control the terms of a different subsequent agreement, it is significant upon the question whether Fralinger would be likely to execute the explanatory agreement, which alone created a written contract in accordance with the terms of the receipt.

I am of the opinion that all the circumstances support the positive testimony of Dr. Marvel that such an agreement was signed, and overcome the negative testimony of the defendants in the sworn answers to the interrogatories.

I will advise a decree that the Fralingers specifically perform the contract as its terms appear in the two mentioned agreements.